UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
LUKE PAUL ROZSA,

       Plaintiff,                                                COMPLAINT

     -against-

NASSAU COUNTY DEPARTMENT OF
SOCIAL SERVICES, WILLOW BAER, in her official
capacity of Commissioner of the New York State Office
for People with Developmental Disabilities, ADVANCE
CARE ALLIANCE NEW YORK,

       Defendants.
------------------------------------------------------------------X

## PRELIMINARY STATEMENT

Plaintiff, Luke Paul Rozsa is an individual diagnosed with autism spectrum disorder, a developmental disability as defined under Mental Hygiene Law § 1.02(22)(a)(1). With the assistance of Home and Community Based Waiver Services ("HCBS Waiver"), provided through the Office for People With Developmental Disabilities ("OPWDD"), Mr. Rozsa has been able to live independently in his own apartment for the past eleven years. However, he requires assistance in money management.

Between January 1, 2023 and May 1, 2024, Mr. Rozsa's rent was partially paid through a COVID-19 rental assistance program. However, Mr. Rozsa was unaware this funding ran out as of May 1, 2024 and, as a result, he did not realize that as of that date, he should have resumed paying his portion of the rent. Rental arrears accrued and his landlord brought eviction proceedings against him.

Mr. Rozsa sought assistance from the Nassau County Department of Social Services ("NCDSS"), a governmental entity that is obligated to provide financial assistance to poor and

1

disabled individuals when necessary to avoid, *inter alia*, a loss of shelter. When the organization that coordinates Mr. Rozsa's care in the community, Advance Care Alliance, New York ("ACANY"), learned that Mr. Rozsa was seeking assistance from NCDSS, it misinformed NCDSS that Mr. Rozsa lacked the ability to live independently, causing DSS to deny Mr. Rozsa's request for emergency funding. As a result, Mr. Rozsa lost his independent apartment and is now homeless.

The plaintiff asserts that the actions of the defendants violated the community integration mandate set forth in *Olmstead v. L.C.*, 527 U.S. 582 (1992) because it keeps him from receiving services in the most integrated setting appropriate to his needs. The actions of NCDSS amounted to a breach of a duty of care to provide assistance to disabled individuals when necessary to maintain shelter. Moreover, the actions of NCDSS and ACANY amounted to a civil conspiracy to violate that duty of care. Mr. Rozsa seeks equitable relief that includes the following: (1) an injunction directing NCDSS to provide him with the assistance to which he was entitled; and (2) an injunction directing that ACANY and Willow Baer, the Commissioner of OPWDD, to take steps to ensure that Mr. Rozsa immediately obtains an apartment that enables him to live independently, as he was before the improper actions of NCDSS and ACANY. Mr. Rozsa also seeks damages from NCDSS and ACANY for violating the community integration mandate of the Americans with Disabilities Act and the duty of care owed to him.

## PARTIES

1. Plaintiff, Luke Paul Rozsa, is a 44 year-old individual who resides in Nassau County and suffers from, *inter alia,* developmental disabilities.

2. Defendant, NCDSS, is a department of the County of Nassau, New York State, which has the responsibility, *inter alia,* to provide financial assistance to disabled individuals when necessary to maintain shelter.

3. NCDSS is responsible for providing social services to eligible individuals pursuant to, *inter alia,* New York Social Services Law and regulations promulgated thereunder.

4. Defendant Willow Baer is the Commissioner of New York State OPWDD.

5. OPWDD is responsible for the care of eligible individuals with a developmental disability, like Mr. Rozsa, under New York State law.

6. OPWDD is further responsible for ensuring the coordination of services for those with developmental disabilities, including, *inter alia*, autism spectrum disorder.

7. Defendant ACANY is a not-for-profit Care Coordination Organization ("CCO") that offers, *inter alia*, comprehensive care coordination of services to people with intellectual and developmental disabilities.

## JURISDICTION

8. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331, which authorizes original jurisdiction in the district courts of civil actions arising under the Constitution, laws or treaties of the United States.

9. Supplemental jurisdiction over plaintiff's state law claims is proper pursuant to 28 U.S.C. § 1367 because the supplemental claims arise out of the same case and controversy as the federal claim.

## RELEVANT STATUTORY AND ADMINISTRATIVE SCHEMES

10. Under the Americans with Disabilities Act ("ADA"), an individual is disabled and hence, protected by the ADA, if, *inter alia,* the individual suffers from a mental or physical

impairment that substantially limits one or more major life activities of the individual or is regarded as having an impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102.

11. Under Title II of the ADA, no qualified individual with a disability shall, by reason of the disability be excluded from participation in, or be denied the benefits of the services, programs or activities of any entity of a state or local government or otherwise subjected to discrimination by the entity of a state or local government. 42 U.S.C. § 12132.

12. Under regulations promulgated pursuant to Title II of the ADA, any entity of a state or local government must administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d).

13. No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of, *inter alia,* services, facilities and advantages of any place of public accommodation by any person who, *inter alia,* leases a place of public accommodation. 42 U.S.C. § 12182(a).

14. A New York Department of Social Services must provide emergency assistance to a disabled adult when the assistance is necessary, *inter alia,* to satisfy rental expenses incurred during the four month period immediately prior to the month in which the person applied for emergency assistance when the assistance is necessary to prevent eviction and, in the judgment of the Social Services official, other housing accommodations appropriate for such person's best interests are not available in a particular area. N.Y. Soc. Serv. Law § 303(m).

15. Emergency Assistance for Adults ("EAA") consists of grants to, *inter alia,* disabled individuals who receive, or are eligible to receive Supplemental Security Income

benefits when EAA is necessary to meet emergency needs, which include shelter.  18 N.Y.C.R.R. §§ 397.1; 397.4.

16. The Commissioner of OPWDD and the Commissioner of Health are responsible for establishing what is known under the Mental Hygiene Law as a "People First Waiver Program," which is also known as home and community based services ("HCBS").  These services aim to develop a model for the coordination of long-term habilitation and health care for people with developmental disabilities.  N.Y. Mental Hygiene Law § 13.40.

## STATEMENT OF FACTS

I. Introduction

17. Mr. Rozsa has been diagnosed with autism spectrum disorder.  He also suffers from attention deficit hyperactivity disorder ("ADHD") and bipolar disorder.

18. Mr. Rozsa has lived independently for eleven years with the help of services through OPWDD's HCBS waiver services program.

19. As a result of his disability, Mr. Rozsa requires some support in general organizational skills and the area of money management.

20. This support can be easily provided through the help of a disability support broker, community habilitation staff, and fiscal intermediaries, all of which are services obtainable through OPWDD by way of either the HCBS waivers services program, or a second program known as Self Direction, detailed *infra* beginning at paragraph thirty.

21. Although OPWDD provides some services directly for its client base, about 80 percent of the services are provided by private not-for-profit organizations.

22. As a condition of receiving HCBS services, individuals on Long Island who are eligible for OPWDD services must select one of three not-for-profit organizations to serve as a CCO.

23. The CCO provides individuals with a care manager who is responsible for an individual's Life Plan, which facilitates the provision of services provided by other organizations. The Life Plan is developed by the individual and his "circle of support," a group of individuals designated to assist the client.

24. ACANY is a not-for-profit CCO utilized by OPWDD to provide services to individuals, pursuant to Mental Hygiene Law § 13.40, cited above.

25. ACANY is the CCO for Mr. Rozsa. ACANY has been Mr. Rozsa's CCO for several years.

26. During that time, several different care managers have managed his case.

27. Throughout the timeline of events pertaining to this lawsuit, ACANY assumed responsibility for providing services to the plaintiff, pursuant to the People First Waiver Program detailed in paragraph sixteen.

28. However, OPWDD retains oversight responsibility for ensuring that Mr. Rozsa receives services through ACANY to address his disabilities.

II. <u>Mr. Rozsa' Ability to Live Independently in the Community with the Assistance of OPWDD's Home Community Based Waiver Services</u>

29. As more fully described below, Mr. Rozsa lived independently in the community for a period of eleven years, with the assistance of OPWDD waiver services.

30. Mr. Rozsa received these services through the HCBS Waiver and an additional program for which Mr. Rozsa is eligible called the Self Direction Program.

6

31. One of the services available to OPWDD eligible individuals is the Housing Subsidy Program, which is provided through either the HCBS Waiver or Self Direction Program.

32. This subsidy, which supplements a person's rent, enables individuals to live independently in the community.

33. To receive this subsidy, an individual must have a fiscal intermediary who manages payments and reimbursements from an individual's yearly OPWDD budget.

34. Mr. Rozsa has received a housing subsidy since 2014 when he began living independently in the community.

35. Independent Support Services ("ISS") is the fiscal intermediary which has paid the housing subsidy portion of Mr. Rozsa's monthly rent to his landlord since Mr. Rozsa has lived independently. Independent Support Services also assists with monthly reimbursements relating to living expenses.

36. Mr. Rozsa first lived independently in an apartment complex located in the City of Long Beach. During this time, he had a part-time job as a security guard and took classes at Nassau Community College towards a plumbing certificate. He maintained his apartment with help from OPWDD services and his mother, who assisted her son with organizational tasks and his finances.

37. Mr. Rozsa, with the help of his mother, found his next apartment, which was located directly across the street from the family home.

38. Mr. Rozsa moved into this apartment in or about 2017. The apartment was operated by Fairfield LB Units, and is located at 979 Oceanfront Avenue Long Beach, New York.

39. Mr. Rozsa's monthly rent was $1750.00. Of this amount, $1211.00 was paid through the housing subsidy, and the remaining $539.00 was paid from a portion of his Social

7

Security benefits. Mr. Rozsa received a monthly benefit payment of approximately $970.00 through the Supplemental Security Income program. Mr. Rozsa did not work during this time.

40. While Mr. Rozsa lived in the Fairfield apartment, he cooked for himself, cleaned the apartment, purchased groceries and did whatever else was necessary to maintain the apartment. Mr. Rozsa also maintained his car.

41. Mr. Rozsa relied on his parents as his circle of support. Mr. Rozsa's mother assisted him with finances and Mr. Rozsa visited his father daily, to receive his advice on daily tasks and life choices, and to help his father with tasks around the house. Mr. Rozsa would also feed and take care of his father's cats.

III.  The Circumstances Culminating in Mr. Rozsa Failing to Pay Rent.

42. On April 3, 2020, Mr. Rozsa's mother died, due to complications from COVID.

43. In or around 2022, Mr. Rozsa's father, now 92, became ill and required a live-in caregiver. He was eventually placed in a nursing home in Plainview, New York. Mr. Rozsa's father's house went into foreclosure and was sold. Mr. Rozsa's father became too ill to assist his son, and Mr. Rozsa did not have any other family members who were willing to help him in the absence of both his parents.

44. During this time-period, Mr. Rozsa continued to live in the apartment close to his father's former home and maintained his daily activities. Although Mr. Rozsa had undertaken some responsibility with respect to familiar tasks like submitting monthly reimbursement requests to ISS, he needed assistance in learning how to manage more complex tasks that were previously undertaken by his parents.

45. Given the collapse of family support, it was appropriate for Mr. Rozsa to have received a HCBS program called "Community Habilitation," for which he was eligible and which he had received previously.

46. Community Habilitation is a program designed to assist people with developmental disabilities to live independently in the community.

47. Community Habilitation can assist with the following: (1) community inclusion and relationship building; (2) development of social skills; (3) financial management skills; and (4) other general tasks and organizational needs.

48. In Mr. Rozsa's case, a Community Habilitation worker could have given Mr. Rozsa one-to-one support in order to educate and guide him with activities like organizing his home and paying bills.

49. Community Habilitation services are delivered through individual providers (known as "self-hired staff") who will come to the person's home and provide different services, as appropriate.

50. These providers can be hired any time a person has access to the HCBS waiver and/or the Self Direction program.

51. Beginning in or about November 2023, Mr. Rozsa tried to obtain Community Habilitation but was unsuccessful.

52. It is often difficult for individuals or their families to obtain Community Habilitation staff because they lack the knowledge to find staff.

53. However, an individual known as a disability broker knows the "ins and outs" of the OPWDD rehabilitation system and has the knowledge to help OPWDD eligible individuals hire necessary community assistance in the form of a Community Habilitation worker.

54. As of February 2025, with the assistance of Legal Services of Long Island ("LSLI"), Mr. Rozsa had hired a disability support broker named Tiffany Donohue. LSLI is the organization that provides civil legal services to low-income, disabled and underserved individuals living in Nassau and Suffolk counties. LSLI has provided legal assistance to Mr. Rozsa.

55. When Mr. Rozsa hired a disability support broker in February 2025, ACANY became aware of this fact.

56. Having a disability support broker meant that Mr. Rozsa was well-placed to obtain community habilitation staff who could assist him in managing his finances from that point on.

57. However, as detailed below, without the necessary assistance with bill paying and, in the absence of any family support, Mr. Rozsa was unable to navigate the financial situation he encountered, which became increasingly complicated as of January. 2023.

58. For the period between January 1, 2023, and May 1, 2024, Mr. Rozsa's rent was being paid through the combination the OPWDD housing subsidy detailed in paragraphs thirty-one through thirty-five and a COVID-19 assistance program called the Emergency Rental Assistance Program ("ERAP") that was funded through the Consolidated Appropriations Act of 2021 and the American Rescue Plan Act of 2021. ERAP resulted in a one lump sum of $12,663.00 on behalf of Mr. Rozsa and included three months of prospective rent.

59. This meant that Mr. Rozsa was not required to pay the monthly amount of $991.00 that he had been paying and Mr. Rozsa stopped paying his share of the rent. However, at the same time, ISS continued to pay the housing subsidy portion of Mr. Rozsa's rent.

60. However, when the ERAP funding ran out, the housing subsidy alone was not sufficient to cover the rent and rental arrears started to accrue.

61. Mr. Rozsa did not have any support from family or any other source of assistance, such as help from Community Habilitation staff. As a result, after May 1, 2024, Mr. Rozsa mistakenly did not use his Social Security benefits to pay his portion of the rent, erroneously believing that ERAP was continuing to cover his rental costs.

62. Mr. Rozsa's landlord then brought a nonpayment eviction proceeding against him in District Court, Landlord-Tenant part.

IV. Mr. Rozsa's Attempts to Avoid Eviction and the Communication Between by ACANY and SCDSS That has Culminated in Mr. Rozsa Becoming Homeless.

63. In Housing Court, Mr. Rozsa was represented by an attorney from LSLI.

64. LSLI negotiated a settlement that would have enabled Mr. Rozsa to continue to live in his apartment. The settlement called for Mr. Rozsa to pay back-rent of $6,608.00, which represented less than four months of his monthly charge of $1750.00, the significance of which is detailed in paragraph 68 *infra*.

65. LSLI then attempted to help Mr. Rozsa secure the necessary funds from NCDSS that would have enabled him to obtain funds to pay the settlement amount owed to his landlord.

66. LSLI met with Mr. Rozsa to prepare him for his meeting with NCDSS. LSLI prepared a letter for Mr. Rozsa, along with supporting documents, for submission to NCDSS, explaining the need for a one-time grant and detailing his eligibility.

67. On or about April 1, 2025, Mr. Rozsa went to NCDSS and applied for assistance.

68. Mr. Rozsa was eligible for an award in the amount that his settlement with the landlord required him to pay under New York Social Services Law § 303(m) because he sought

11

funds to pay less than four months of outstanding rent and met the criteria for assistance because he received Supplemental Security Income ("SSI") benefits.

69. Because Mr. Rozsa needed assistance to enable him to keep his shelter and received SSI benefits, he was eligible for a grant under the EAA program.

70. The particular type of grant that Mr. Rozsa was eligible for was the Emergency Assistance to Adults ("EAA") grant, a grant program exclusively for those receiving SSI benefits.

71. When Mr. Rozsa met with NCDSS, the agency learned that Mr. Rozsa was eligible for assistance in managing his finances, as Mr. Rozsa notified NCDSS that he had a disability broker.

72. On or about the time of Mr. Rozsa's application, NCDSS began communicating with Mr. Rozsa's care manager from ACANY and learned that Mr. Rozsa had been receiving care management services from ACANY.

73. On the day of Mr. Rozsa's application, April 1, 2025, NCDSS denied Mr. Rozsa's application for relief on the ground that Mr. Rozsa did "not have financial management set up."

74. This was, at best, a disingenuous reason to deny the application as Mr. Rozsa had hired a disability broker who was in a position to obtain the services on Mr. Rozsa' behalf of an individual who could provide financial management.

75. The awarding of an EAA grant to Mr. Rozsa would have ensured that Mr. Rozsa could continue to live in his apartment.

76. Following the denial of his application, Mr. Rozsa, through his attorney, LSLI, challenged this decision by seeking a fair hearing, as is his right under New York law, 18 N.Y.C.R.R. § 358-2.12.

77. On May, 5, 2025, the administrative law judge held that NCDSS erred in its determination denying relief to Mr. Rozsa and directed the agency to cancel its initial decision and reprocess his application.

78. Sometime between May 2, 2025, and May 9, 2025, Mr. Rozsa's ACANY care manager instructed him to go to NCDSS.

79. On or about May 9, 2025, Mr. Rozsa went to NCDSS at his ACANY care manager's request and telephoned her when he arrived.

80. Mr. Rozsa, at the request of his care manager, called his care manager when he met with a DSS case worker. At his care manager's request, Mr. Rozsa put the phone on speaker so that this care manager could be part of the conversation. The NCDSS case worker took the phone away from Mr. Rozsa and went into a back office where Mr. Rozsa could not hear or participate in their conversation When the NCDSS worker came back, she had already hung up the phone and Mr. Rozsa was unaware of what they spoke about and neither NCDSS nor ACANY informed Mr. Rozsa of what their conversation involved.

81.  At or around this time, in order to lessen the amount of money Mr. Rozsa required, the LSLI attorney contacted a representative from the Emergency Solutions Grant ("ESG") program.

82. ESG is a program operated, upon information and belief, by Nassau County's Office of Community Development , whose mission includes, *inter alia*, helping tenants maintain housing.

83. ESG agreed to pay nearly half of Mr. Rozsa's rental arrears.

84. On May 16, 2025, the LSLI attorney then contacted NCDSS in an attempt to have the application reprocessed in light of this additional funding offer.

85. In a series of emails from May 16. 2025 through May 22, 20225 NCDSS informed LSLI that it reaffirmed it original decision denying Mr. Rozsa's application.

86. NCDSS stated that Mr. Rozsa's father was his representative payee.  NCDSS added that Mr. Rozsa could not afford to pay his ongoing rent, household expenses and repay the grant award he sought from NCDSS, which NCDSS asserted he would have been required to do. Finally, SCDSS added that Mr. Rozsa's ACANY case manager had other available housing for him.

87. In a subsequent email NCDSS asserted that Mr. Rozsa could not live independently because he  "needed a higher level of care and assistance due to his mental illness."

88. In explaining the denial of Mr. Rozsa's application NCDSS further added that Mr. Rozsa's case manager at ACANY was "in the process of facilitating suitable and appropriate housing" for Mr. Rozsa.

89. As of May 22, 2025, Mr. Rozsa had been evicted from his apartment. Accordingly, NCDSS added that further consideration of Mr. Rozsa's application was unnecessary because Mr. Rozsa had been evicted, which rendered his need for assistance moot.

90. On May 22nd, when informing LSLI of its denial of assistance to Mr. Rozsa, NCDSS referred LSLI to ACANY, stating that ACANY had available housing for Mr. Rozsa.

91. As detailed below, this turned out to be false.

92. On or about May 22, 2025, ACANY, ISS, Mr. Rozsa and LSLI met to discuss Mr. Rozsa's living situation.

93. At the meeting, Mr. Rozsa's care manager admitted to speaking with NCDSS regarding Mr. Rozsa's housing case.

94. At that same meeting, ACANY suggested that Mr. Rozsa live in a group home and that residing in a group home is the only way a supported apartment would accept him in the future. Mr. Rozsa stated he did not want to live in a group home and wanted to live in his own apartment or a supported apartment.

95. ACANY stated that it lacked immediate housing for Mr. Rozsa - neither emergency housing situation that NCDSS indicated ACANY would provide, nor the type of independent apartment setting that Mr. Rozsa sought and the housing for which his Life Plan called.

96. Rather, ACANY referred Mr. Rozsa back to NCDSS for temporary housing assistance to place Mr. Rozsa in the emergency shelter system provided by NCDSS.

97. Upon information and belief ACANY provided information to NCDSS that Mr. Rozsa required a higher level of care to live independently as a result of his mental illness. In so doing, ACANY provided information to NCDSS that falsely portrayed Mr. Rozsa as lacking the ability to live in the type of independent living setting he had been living in for the previous eleven years, including the last eight years in his Fairfield apartment, and that he would have been able to continue to live in had NCDSS provided the assistance for which Mr. Rozsa applied.

98. Notably, as late as February 2025, ACANY developed a Care Coordination Life Plan for Mr. Rozsa that called for him to continue to live independently in the community.

99. From February 2025, through the present date, Mr. Rozsa's clinical condition has remained unchanged, and he did not manifest a diminution of life skills in any way.

100. From February 2025 through his eviction Mr. Rozsa continued to live in his apartment without assistance and did all the daily activities that he had been doing through the time ACANY developed a Care Coordination Life Plan.

101. The other reasons for denying Mr. Rozsa's request for assistance lacked merit.

102. If Mr. Rozsa had been provided a grant under the EAA program, under governing regulations, he would not have been required to repay the grant. Furthermore, the ESG grant would have reduced the amount that NCDSS would have contributed towards the rental arrears.

103. Having a parent never interfered previously with Mr. Rozsa's payment of rent and Mr. Rozsa' disability broker was in a position to hire someone with money management skills who would have ensured that Mr. Rozsa's payment of rent would not have been compromised in any way.

104. As a result of the actions of NCDSS and ACANY, Mr. Rozsa is now homeless and lives out of his car.

105. In addition to being homeless, the failure of NCDSS to provide a grant to Mr. Rozsa means he lacks the ability to pay the judgment against him issued by District Court.

106. This creates the likelihood that future landlords will deem him a bad credit risk, thereby lessening his ability to obtain independent living.

LEGAL ALLEGATIONS

First Cause of Action

107. The plaintiff realleges paragraphs one through 106.

108. By denying Mr. Rozsa benefits that would have enabled him to keep his apartment and hence, enable him to live independently, on the ground that he required a higher level of care due to his mental illness, even though Mr. Rozsa's clinical condition enabled him to live in an independent setting, NCDSS violated Mr. Rozsa's rights under 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(d) because NCDSS's actions resulted in Mr. Rozsa no longer receiving

People First Waiver Services and living in the most integrated setting appropriate to Mr. Rozsa's needs.

## Second Cause of Action

109. The plaintiff realleges paragraphs one through 106.

110. By providing erroneous information to NCDSS that falsely indicated that Mr. Rozsa lacked the ability to live independently, ACANY caused Mr. Rozsa to lose his independent living and hence violated 42 U.S.C. § 12182.

## Supplemental State Law Claims

## Third Cause of Action

111. The plaintiff realleges paragraphs one through 106.

112. By failing to provide financial assistance to Mr. Rozsa when it was necessary for him to maintain shelter and no basis existed for denying assistance to him, NCDSS breached a duty of care and hence acted negligently.

## Fourth Cause of Action

113. The plaintiff realleges paragraphs one through 106.

114. By ACANY providing erroneous information to NCDSS that falsely indicated that Mr. Rozsa lacked the ability to live independently, which resulted in NCDSS also wrongfully believing that Mr. Rozsa lacked the ability to live independently, which in turn resulted in NCDSS breaching a duty of care to Mr. Rozsa, which in turn resulted in Mr. Rozsa losing his ability to live independently to which he was entitled under the People First Waiver Program, NCDSS and ACANY engaged in a civil conspiracy to violate a duty of care to Mr. Rozsa and his right to live in the most integrated setting appropriate to his needs in violation of 28 C.F.R. § 35.130(d).

WHEREFORE, the plaintiff requests the following relief:

(a)  a declaration pursuant to Fed.R.Civ.P. 57 and 28 U.S.C. § 2201 declaring that by denying Mr. Rozsa benefits that would have enabled him to keep his apartment and hence, enable him to live independently, on the ground that he required a higher level of care due to his disability when Mr. Rozsa's clinical condition enabled him to live in an independent setting, NCDSS violated Mr. Rozsa's rights under 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(d) because NCDSS's actions resulted in Mr. Rozsa no longer receiving People First Waiver Services and living in the most integrated setting appropriate to Mr. Rozsa's needs;

(b)  a declaration pursuant to Fed.R.Civ.P. 57 and 28 U.S.C. § 2201 declaring that by providing erroneous information to NCDSS that falsely indicated that Mr. Rozsa lacked the ability to live independently, ACANY caused Mr. Rozsa to lose his independent living and hence violated 42 U.S.C. § 12182.

(c)  a declaration pursuant to Fed.R.Civ.P. 57 and 28 U.S.C. § 2201 declaring that by failing to provide financial assistance to Mr. Rozsa when it was necessary for him to maintain shelter and no basis existed for denying assistance to him, NCDSS breached a duty of care and hence, acted negligently;

(d)  a declaration pursuant to Fed.R.Civ.P. 57 and 28 U.S.C. § 2201 declaring that by ACANY providing erroneous information to NCDSS that falsely indicated that Mr. Rozsa lacked the ability to live independently, which resulted in NCDSS also wrongfully believing that Mr. Rozsa lacked the ability to live independently, which in turn resulted in NCDSS breaching a duty of care to Mr. Rozsa, which in turn resulted in Mr. Rozsa losing his ability to live independently to which he was entitled under the People First Waiver Program, NCDSS and ACANY engaged

in a civil conspiracy to violate a duty of care to Mr. Rozsa and his right to live in the most integrated setting appropriate to his needs in violation of 28 C.F.R. § 35.130(d);

(e) an injunction pursuant to 28 U.S.C § 2202 directing NCDSS to re-evaluate Mr. Rozsa's application for financial assistance and grant the application in an amount that will enable Mr. Rozsa to pay off the judgment assessed against him and further assist him, if necessary, in obtaining an apartment in which he can live independently;

(f) an injunction pursuant to 28 U.S.C. § 2202 directing ACANY to take steps to immediately facilitate the obtaining of an independent apartment for Mr. Rozsa and further directing defendant Baer to ensure that ACANY complies with its responsibility to obtain an independent apartment for Mr. Rozsa;

(g) compensatory damages in an amount to be determined at trial;

(h) attorneys' fees pursuant to 42 U.S.C. §§ 12205;

(i) costs and disbursements; and

(j) such other relief that this Court deems just and proper.

Dated: Port Washington, New York
July 22, 2025

WILLIAM M. BROOKS
Center for Justice, Civil Rights and Liberties, Inc.
*Attorney for Plaintiff*
P.O. Box 421
Port Washington, New York 10050
(516) 439-5169
Williamb@cjcrl.org

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
LUKE PAUL ROZSA,

        Plaintiff,

    -against-                                                      JURY DEMAND

NASSAU COUNTY DEPARTMENT OF
SOCIAL SERVICES, WILLOW BAER, in her official
capacity of Commissioner of the New York State Office
for People with Developmental Disabilities, ADVANCE
CARE ALLIANCE NEW YORK,

        Defendants.
-------------------------------------------------------------------X

    The plaintiff demands a jury in the above-captioned matter.

Dated: Port Washington, New York
        July 22, 2025

                                                        _____
                                                          WILLIAM M. BROOKS
                                                          Center for Justice, Civil Rights and
                                                          Liberties, Inc.
                                                          *Attorney for Plaintiff*
                                                          P.O. Box 421
                                                          Port Washington, New York 10050
                                                          (516) 439-5169
                                                          Williamb@cjcrl.org